IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 12, 2020

**STATE OF TENNESSEE v. CATHERINE ANN PINHAL**

**Appeal from the Criminal Court for Davidson County**
**Nos. 2019-A-155, 2019-A-203, 2019-A-791     Angelita Blackshear Dalton, Judge**

_____

**No. M2019-01516-CCA-R3-CD**

_____

The Defendant, Catherine Ann Pinhal, was convicted upon her 2019 guilty pleas of vehicular homicide by reckless conduct, a Class C felony, and two counts of possession of contraband in a penal facility, a Class C felony. *See* T.C.A. §§ 39-13-213 (2019) (vehicular homicide); 39-16-201 (2019) (possession of contraband).  The length and manner of service of her sentence were reserved for the trial court's determination.  After a sentencing hearing, the trial court imposed six years for the vehicular homicide conviction and four years for each possession of contraband in a penal facility conviction.  The court, likewise imposed partial consecutive service, for an effective ten-year sentence in confinement.  On appeal, the Defendant contends that the trial court erred by denying her request for alternative sentencing and by imposing consecutive service.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Kevin McGee (on appeal and at sentencing), Richard McGee (on appeal and at sentencing), and Lisa Naylor (at sentencing), Nashville, Tennessee, for the appellant, Catherine Ann Pinhal.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Kyle Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's vehicular homicide conviction relates to a September 2018 traffic crash in which the Defendant's Cadillac Escalade struck the vehicle being driven by Gilda York, who died at the scene.  After an arrest warrant was issued for vehicular homicide,

the Defendant turned herself in to the police, at which time a substance containing methamphetamine was found on her person. While in confinement at the jail, the Defendant's then-boyfriend sent the Defendant a greeting card containing Suboxone.

At the guilty plea hearing, the State's recitation of the facts were as follows:

> . . . [O]n September 22, 2018 at approximately 9:51 p.m. . . . the defendant crossed her Cadillac Escalade into the oncoming lane of travel and struck a Honda Element driven by Gilda York head-on. Ms. York died at the scene.
>
> The defendant was transported to the hospital where she was lethargic and slow to respond to questions. She stated that she had been driving and smoking marijuana. A blood sample was taken and it showed several prescription drugs in her system at the time of the crash.
>
> . . . [O]n November 3, 2018 at 2 in the morning the defendant turned herself in on warrants from the vehicular homicide case to booking here in Davidson County. She was searched and asked multiple times if she had anything on her person such as drugs or weapons. She stated that she did not, but during the search . . . they found a bag near her waistband of one gram of a substance that later tested positive for methamphetamine.
>
> . . . [O]n December 27, 2018 a mail clerk at . . . a correctional facility was searching the mail . . . and recovered an orange substance that had been melted down and put inside of a greeting card addressed to the defendant. It tested positive for Suboxone.
>
> Investigators compared the card[] to cards of similar writing that were sent by Cody Caldwell, Pinhal's boyfriend. Investigators reviewed the jail calls and found a call between Caldwell and the defendant discussing sending Suboxone inside a greeting card to her. Based on those facts, Your Honor, we recommend the previously announced disposition, which is a sentencing hearing.

At the sentencing hearing, the presentence report was received as an exhibit. The report showed that the twenty-eight-year-old Defendant had previous convictions for speeding, evading arrest, misdemeanor theft, misdemeanor drug possession, possession of drug paraphernalia, and two counts of driving while her license was suspended. Copies of the general sessions warrants and case histories, probation violation reports, and Tennessee Department of Safety criminal history reports were received as an exhibit. In addition to the offenses reflected in the presentence report, the documents reflected convictions for

misdemeanor drug possession, two speeding violations, failure to present proof of insurance, and failure to present identification. Likewise, the documents reflected multiple probation revocations.

The presentence report reflected that in 2009, the Defendant graduated from high school. She first reported drinking alcohol and smoking marijuana in 2002, and she reported frequent use of both. She reported frequent use of methamphetamine in 2018. She reported frequent use of cocaine between 2009 and 2018. The presentence report reflected that the Defendant had entered eight substance abuse treatment programs between 2009 and 2016.

The Defendant reported having fair mental health and having been diagnosed with anxiety, post-traumatic stress syndrome, bipolar disorder, and depression. She reported being prescribed Zoloft. She reported good physical health and being pregnant. She reported that her "childhood was stressful and family relationships were always distant." She reported employment at retail establishments between 2013 and 2014, and between 2010 and 2011. The Strong-R assessment showed that the Defendant had "a score of high for drugs."

The Defendant provided a statement to the presentence investigator, which she later read at the sentencing hearing. The Defendant stated that on the night of the traffic crash, she left home after having argued with her roommate. She said that she called her then-boyfriend while driving her vehicle. She stated that it was raining, that it was difficult to see the roadway, and that she was complaining to her boyfriend about her roommate. She said that the next thing she recalled was that "out of nowhere my vehicle abruptly stopped dead in [its] tracks." She said that she crashed into another vehicle head-on, that she did not recall "seeing the vehicle, it's lights or anything." She recalled extensive pain. She stated that she suffered a mild concussion, fractured ribs, a punctured lung, cuts, and bruises. She said the other driver died at the scene. The Defendant did not know the victim personally but said that the Defendant had learned the victim was an "outstanding person." The Defendant acknowledged that her conduct claimed the victim's life and said that if she "could take it all back, [she] would." The Defendant apologized to the victim's family, expressed remorse, and asked for the family's forgiveness.

The toxicology report was received as an exhibit. The report did not reflect the presence of alcohol but reflected the presence of marijuana metabolites, methamphetamine, amphetamine, Fentanyl, norfentanyl, cocaine, benzoylecgonine, diazepam, nordiazepam, and alprazolam.

Likewise, the preliminary hearing testimony of Metropolitan Nashville Police Crime Lab Toxicology Unit Supervisor Amanda Sweet was received as an exhibit. Ms. Sweet, an expert in toxicology, testified that alcohol was not present in the Defendant's

system at the time of the crash. Ms. Sweet determined, though, that the Defendant had multiple substances in her system, which included inactive marijuana metabolites, active methamphetamine compounds, an indiscernible amount of amphetamine, fentanyl, inactive metabolites of fentanyl, active cocaine compounds, inactive metabolites of cocaine, diazepam, inactive metabolites of diazepam, and alprazolam. Ms. Sweet could not determine whether the Defendant was impaired at the time of the blood draw because many factors impacted impairment, because she had not reviewed the Defendant's medical records, and because she was not present at the scene of the crash.

Ms. Sweet testified that the therapeutic dose of diazepam, also known as Valium, was 20 to 4000 nanograms per milliliter and that the amount in the Defendant's system was 37 nanograms. Ms. Sweet stated that the therapeutic dose of alprazolam, also known as Xanax, was 25 to 102 nanograms and that the amount in the Defendant's system was 16 nanograms. Ms. Sweet stated that the therapeutic dose of fentanyl was 1 to 3 nanograms and that the amount in the Defendant's system was 10 nanograms, which Ms. Sweet described as "toxic." Ms. Sweet said that the Defendant could have been experiencing some of the side effects. Ms. Sweet stated that the therapeutic range for methamphetamine, when used for attention deficit disorder or weight management, was 10 to 15 nanograms and that the toxic amount in the Defendant's system was 515. Ms. Sweet stated that whether the Defendant felt the side effects depended on whether the Defendant had been taking the drug regularly.

On cross-examination, Ms. Sweet testified that she did not perform testing to determine if heroin was present in the Defendant's system because heroin metabolized quickly. Ms. Sweet determined, though, that heroin metabolites were not present in the Defendant's system. Ms. Sweet said that morphine was found in the Defendant's system but that the amount was below the "reportable level."

On redirect examination, Ms. Sweet testified that side effects of fentanyl in the context of operating a motor vehicle included slowed driving, weaving, poor vehicle control, poor coordination, slow response to stimuli, delayed reaction, difficulty following instructions, and potentially falling asleep at the wheel. She stated that the side effects of methamphetamine included increased breathing and heart rate. She said that combining fentanyl and methamphetamine could create confusion, hallucinations, tachycardia, and death at high levels. She said that side effects of alprazolam and diazepam included difficulty concentrating, drowsiness, and unsteadiness. She stated that taking multiple substances could create a synergistic effect on the central nervous system, enhancing the side effects of each substance.

Letters describing the victim and the impact of her death were received as an exhibit. The letters were written by members of the victim's family, friends, and community members.

Robert York, Jr., the victim's husband, read a prepared statement to the trial court. Mr. York stated that he and the victim met on a blind date in October 1979, and that they married in June 1981. Mr. York discussed his and the victim's plans to sell the victim's business and to travel for their upcoming thirty-eighth and fortieth wedding anniversaries. Mr. York discussed the victim's love for Christmas and the happiness she experienced by bringing joy to her family. Mr. York said that the victim found "her calling" when she established the "Ambassadors and Social Graces" program, which he described as a formalwear business. He said that the victim's business worked with high school students, providing them with "instruction for proper manners and etiquette and appropriate attire for all types of situations." He said that the victim taught teenagers the "value of a firm handshake and looking the person in the eye when speaking and active listening when being spoke to." He said that the victim likewise taught them the importance of community service by serving dinner to the elderly, picking up trash along roadways, cooking holiday meals for the less fortunate, and working as "bell ringers" for the Salvation Army Red Kettle drive. Mr. York said that the victim "touched the lives" of many young men and women, who were continuing their community service in the victim's memory.

Mr. York recalled that on the night of the offenses, the victim was driving home from a volunteer event involving Ambassador and Social Graces. He said that his happiness was taken away in an instant by the Defendant, who was too impaired to drive. He said losing the victim was the most devastating event of his life because the victim was the "center of his world." He discussed his present struggles of living without the victim.

Mr. York stated that the Defendant should never have been driving and that she showed a "total disregard" for the Defendant's safety and for everyone else driving that night. Mr. York stated that the Defendant crossed two lanes of traffic, that the evidence did not show the Defendant attempted to brake, and that the victim, who was age fifty-seven, suffered a fatal laceration to the aorta. Mr. York requested that the trial court impose the maximum sentence based upon the Defendant's drug use and previous drug-related convictions. Mr. York stated that the Defendant's lack of remorse bothered him most, noting that the Defendant did not inquire about the victim's well-being at the scene.

Robert York III, the victim's son, read a prepared statement to the trial court. Mr. York said that he last saw his mother twenty days before the crash. He said that the victim had retired recently and looked forward to spending time with her husband and her grandchildren. He said that the victim would no longer act as a "second mother" to the teenagers she mentored. He said that the day he learned of his mother's death was the worst day of his life and that he later learned the crash was not a "freak accident." Mr. York discussed his emotional difficulties following the crash and stated he had attended all but one court appearance in this case. He said that the Defendant had deprived him and his children of the victim and that he desired justice for his mother. He requested the maximum

sentence based upon the severity of the offense, the Defendant's lack of remorse, and the fear she could hurt someone in the future.

Lindsay York, the victim's daughter, read a prepared statement to the trial court. Ms. York stated that it was impossible to summarize in a few minutes how the victim shaped her life and how much the victim would be missed. Ms. York said that the Defendant made a selfish decision to endanger the victim and others. Ms. York described the victim as a giver and said she would attempt to honor the victim by living a similar life. She requested a sentence that represented the impact of the Defendant's conduct.

Lelan Statom, the parent of one of the victim's "youth members," read a prepared statement to the trial court regarding the victim's impact on the community. He said that the victim's gift was working with teenagers to teach responsibility and giving back to the community. Mr. Statom said that his son was an Ambassador of Social Graces and that it was "heartbreaking" to observe the impact of the victim's death on the teenagers with whom the victim worked. Mr. Statom requested the maximum sentence for rehabilitation purposes.

Mark North, the victim's colleague in various community organizations, read a prepared statement to the trial court. Mr. North discussed the victim's extensive involvement in community organizations and described the victim as courageous, empathetic, and dedicated. He said that the victim's death resulted in an enormous loss to all of humanity.

Miles Adcox testified for the defense that he managed Onsite, a mental health treatment facility that focused on substance abuse and underlying mental health issues which drive addiction. Mr. Adcox stated that childhood sexual abuse was a "trigger for trauma" that impacted young adults.

Mr. Adcox testified that the Defendant underwent treatment at Onsite two years before the sentencing hearing. He said that during the Defendant's treatment, she disclosed for the first time that she had been the victim of child sexual abuse. He said that although the Defendant did not succeed during her previous treatment attempts, he thought the Defendant could succeed because Onsite already had a history with the Defendant that did not require starting a new treatment plan. He said that addiction and mental health issues were complicated and that relapse was "scientifically proven to be a condition that until treated the right amount of times, multiple times, that you absolutely can recover from it." He said that based upon the Defendant's treatment history, his team of professionals had determined that she wanted to "get better" and could be successful with a long-term, structured treatment plan.

On cross-examination, Mr. Adcox testified that he recommended the "Milestones" program at Onsite for the Defendant. He agreed that the Defendant had received treatment at Onsite between August 2, 2016 and November 1, 2016, and again between January 9, 2015 and April 15, 2015. He did not recall whether the treatment periods were court ordered. He said that the Milestones program was a long-term residential rehabilitation program that spanned thirty to ninety days. He said that Onsite had experience working with probation officers and trial courts and with making required notifications regarding defendants.

Mr. Adcox testified that he was familiar with the addiction treatment programs known as The Ranch, JourneyPure, New Life Lodge, and Cumberland Heights. He agreed that the Defendant had received treatment at these facilities previously and that the Defendant had suffered multiple relapses. He agreed that if the Defendant were to receive treatment at Onsite again, the concern was the Defendant would leave, suffer another relapse, and another "tragedy" would occur. He stated that Onsite was not a secure facility. He said that after the Defendant's previous treatment period, Onsite offered the Defendant a discretionary "aftercare plan" that she could follow. He said, though, that if the Defendant were to receive additional treatment, she needed "as much structure" as possible. He recommended case management and additional mental health treatment after completing the Onsite program. He determined that the Defendant's previous treatment programs were not effective because those programs did not focus on mental health. Mr. Adcox stated that he would remain involved in the Defendant's long-term treatment after she completed the Onsite program.

Andrea Driver, Program Director for the Department of Correction Day Reporting Center, testified that the program provided substance abuse treatment services and support to probationers and parolees. Ms. Driver said that the intensive out-patient program was created in 2018, that it was a nine- to twelve-month program, and that it consisted of three phases. She said that phase one lasted three to four months and required a participant to report four days per week from 8:30 a.m. to 2:00 p.m. for various classes, which included anger management, family relations, substance abuse treatment, and relapse prevention. She said that a participant was assigned a licensed clinical social worker and correctional counselor, who created a treatment plan and referrals as needed. She said that a participant met with an employment specialist, performed weekly community service, and underwent routine drug screens.

Ms. Driver testified that phase two of the program lasted three to four months and required a participant to report three days per week and to continue the classes required in phase one. She said that additional required classes focused on a twelve-step "Recognition Therapy" class and that a participant was required to obtain employment. She said that promotion to phase three involved a visible change in behavior. She said that a participant in phase three showed more responsibility, worked full-time, took on leadership roles

within the program, and had negative drug screens. She said that phase-three participants reported twice weekly and interacted with phase one and two participants to demonstrate the positive benefits of the program. She said that participants performed eighty hours of community service by the completion of the program.

Ms. Driver testified that the program had thirty-nine participants and that the program had its first graduation in April 2019. She said that after graduation, a defendant moved into an "after-care program," during which a defendant reported once per week to maintain contact with a counselor and a probation officer and to undergo drug screens. Ms. Driver stated that the Defendant's participation in Onsite would be beneficial before the Defendant began the Day Reporting Center program. Ms. Driver said that the Defendant had been evaluated for the program and that the Defendant had satisfied the criteria for admission. The assessment and eligibility report was received as an exhibit and reflected that the Defendant had the potential to be a successful candidate and that the Defendant could benefit from drug use and addiction therapy, job readiness training, and additional classes. Ms. Driver noted that the Defendant was pregnant and that her treatment would extend beyond the birth of her child. Ms. Driver said that if the Defendant were able to report as required by the program, the Defendant could participate.

On cross-examination, Ms. Driver testified that the program could assist a participant with transportation. She agreed that the Department of Correction offered substance abuse and mental health treatment for a person confined to a correctional facility. On redirect examination, Ms. Driver stated that the purpose of the Day Reporting Center program was to reduce recidivism and to provide services to a participant released on community supervision. She said that the treatment and services provided in the program surpassed what was available to a person in confinement.

Amber Sudzius, program specialist for the community corrections Dual Diagnosis Program, testified that the program provided substance abuse and mental health treatment for a defendant sentenced to community corrections. She said that the program was "very intense probation," that a participant reported once per week "for groups" focusing on substance abuse and mental health, that a participant reported to a case officer and underwent drug screens, and that community correction officers performed home visits. She noted that the program had a community service requirement of 120 hours.

Ms. Sudzius testified that she evaluated the Defendant for the program. Ms. Sudzius said that the Defendant provided a release for treatment records and was eager to establish a treatment plan for an alternative sentence to help herself and her unborn child. Ms. Sudzius said that the Defendant disclosed having been diagnosed with post-traumatic stress syndrome, bipolar disorder II, and generalized anxiety, all of which were verified by medical records. Ms. Sudzius stated that the program would address the Defendant's mental health issues with a social worker, a psychiatrist, and the Defendant's regular

mental health provider. Ms. Sudzius said that the program required full-time employment, as well.

Ms. Sudzius testified that the Defendant had also been accepted at a halfway house program called Restoration House, which required alcohol and substance abuse treatment in addition to the requirements of the Dual Diagnosis Program. She said that communication existed between the two programs to ensure the Defendant complied with the "extensive" requirements of each program. She said that the Defendant would be enrolled in both programs for six months or longer. Ms. Sudzius believed the Defendant could be successful in each program if she availed herself to all of the programs' resources.

The Defendant testified that she would never be able to apologize enough for the pain she had caused the victim's and her families. She said that the victim was a wonderful person and that she thought of and prayed daily for the victim and her family.

The Defendant testified that her family and friends were present for the sentencing hearing and that she had family support. She said that she grew up with her parents and siblings and that an older cousin began living with her family when she was age nine. She said her cousin's mother had "addiction issues" and could not care for her cousin. The Defendant said that she "looked up" to her cousin but that her cousin sexually abused her for a "couple of months" when she was age nine and her cousin was age fourteen or fifteen. She said that her cousin told her "it was okay and not to tell anybody." She said her cousin told her that he would "hurt" her if she told anyone, that nobody would believe her, and that he would no longer be her cousin anymore. She said that she was confused but that she believed it was her fault. She denied telling anyone about the abuse at the time but said it occurred too many times to count. She said that she told her parents about the abuse two years before the sentencing hearing when she was at Onsite for treatment. She said that she first disclosed the abuse to her therapist at Onsite and that her therapist encouraged her to tell her parents and siblings. The Defendant said her family had been more involved with her counseling and treatment since her disclosure.

The Defendant testified that she began drinking alcohol and smoking marijuana at age twelve or thirteen and that she had also used heroin, cocaine, and methamphetamine. She said that drugs helped her cover up the pain and trauma of the sexual abuse. She explained that she did not think about the abuse when she used drugs and that drugs helped her cope. She said her drug use escalated over time and had been a consistent problem. She said that she entered an in-patient treatment program at age eighteen and that the treatment did not go "so well" because she was not ready for treatment at this time. She said she had entered "[q]uite a few" treatment programs for substance abuse. She said that Onsite was the only treatment program that had addressed her mental health issues. She said that the providers at Onsite had helped her understand her mental heath disorders and

her decision-making process. She said that she would participate fully in all of the treatment programs discussed at the sentencing hearing.

The Defendant testified that she was pregnant with a healthy boy, that her due date was about one month after the sentencing hearing, and that she had relinquished her parental rights to her parents, who would take custody of her son at birth. She said she learned about her pregnancy after about one month in confinement and did not know she was pregnant at the time of the crash. She recalled drinking alcohol and smoking marijuana the night before the crash and said she reported this to the police officers at the scene.

The Defendant testified that she possessed methamphetamine when she turned herself in to the police. She said that she did not realize it was in her waistband. Relative to the Suboxone her then-boyfriend attempted to send to her through the mail, she explained that she was scared, that she had learned she was pregnant, that her parents would not pay her bond, that she "went along with it," and that she could only think about getting out of jail and taking care of her unborn child. She denied that she intended to use the Suboxone and said that she intended to sell it to an inmate in order to pay her bond. She agreed it was a "stupid" plan and said she took responsibility for it.

On cross-examination, the Defendant testified that she was unsure what would have happened if she had been able to pay her bond. She denied, though, that she would have returned to using drugs, noting her pregnancy. She said that inmates were willing to pay almost $200 for "a strip" of Suboxone. She agreed she would have needed to sell multiple doses of Suboxone to pay her bond.

The Defendant testified that the crash occurred at 9:51 p.m. and that although she had multiple substances in her system, she did not consume all of them on the day of the crash. She said that she used the drugs listed in the toxicology report over a period of time with her roommate but that she generally used drugs daily at this time. The Defendant said that she "flattened" her sentence in an unspecified case after her probation was revoked after she was arrested for possession of drug paraphernalia and evading arrest. She said that when she was arrested for a probation violation, she "walked off and . . out the door" at the courthouse because she was left unhandcuffed and unattended. She said that as a result, she was charged with evading arrest. She said that the probation violation was based upon her overdosing on heroin.

The Defendant testified that she had drug-related convictions for cocaine and morphine in 2014 and that she violated her probation by leaving a halfway house. She did not consider herself to be a safe driver and agreed she had three speeding convictions. She agreed her record showed that she generally used drugs and failed to comply with the terms of probation. She understood the concern of what might happen if she relapsed again while on probation but said this time was different. She explained that before the crash, she did

not think she could have caused so much damage to anyone other than herself. She said that she had not realized the seriousness of drug addiction and its consequences until the crash. She said that she had not had anything to live for until she became pregnant. She stated that she took responsibility for killing the victim and that the crash "was an accident" because she did not intend to kill the victim.

On redirect examination, the Defendant testified that she instructed defense counsel not to disclose her pregnancy to the prosecutor and to the trial court in an effort to obtain a favorable outcome in this case.

The trial court considered the principles of sentencing, the evidence presented at the guilty plea and sentencing hearings, and the presentence report in determining the Defendant's sentence. The court likewise considered the Defendant's personal history, history of substance abuse treatment, and the Defendant's proposed treatment plan. The court determined that no mitigating factors applied. *See* T.C.A. § 40-35-113 (2018).

The trial court applied enhancement factors (1), (8), and (10). *See id*. § 40-35-114 (2018). The court determined that the Defendant had previous convictions for possession of cocaine, possession of morphine, unlawful possession of drug paraphernalia, theft, evading arrest, and speeding. *See id*. § 40-35-114(1) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court found, based upon the presentence report and additional evidence of the Defendant's previous convictions, that the Defendant had previously received probation and that the Defendant violated the conditions of her release multiple times. The court determined that the Defendant received probation for possession of cocaine, that the Defendant violated the conditions of her release twice, and that one violation was based upon an arrest for possession of morphine. The court found that the Defendant received probation for the possession of morphine and drug paraphernalia convictions and that the Defendant violated the conditions of her release. The court determined that the Defendant likewise received probation for another possession of drug paraphernalia conviction and that she violated the conditions of her release. *See id*. § 40-35-114(8) ("Before trial or sentencing, the defendant failed to comply with the conditions of a sentence involving release into the community[.]"). The court determined that the Defendant had no hesitation about committing a crime when the risk to human life was high. *See id*. § 40-35-114(10). The court found that the evidence showed the Defendant voluntarily consumed multiple intoxicants and knowingly operated a motor vehicle while under the effects of the intoxicants.

The trial court expressed concern about the serious nature of the offense and about the "circumstances and the neglectful decision of operating a motor vehicle after voluntarily consuming multiple intoxicants which resulted in the unfortunate death of the victim." The court stated that the Defendant's criminal history and failure to comply with

the terms of her previous probation "compounded" the court's concern. The court sentenced the Defendant to six years for the vehicular homicide conviction and to four years for each drug-related conviction.

In ordering partial consecutive service, the trial court determined that the Defendant had an extensive record of criminal activity based upon her convictions for two counts of possession of a controlled substance, possession of drug paraphernalia, theft, evading arrest, and speeding and upon the Defendant's failed attempts to complete pervious terms of probation. *See id.* § 40-35-115(b)(2) (2018).

The trial court likewise determined that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and that the Defendant had no hesitation about committing a crime in which the risk to human life was high. *See id.* (b)(5). The court based its determination upon the Defendant's voluntary consumption of multiple intoxicants and knowingly operating a motor vehicle while the intoxicants were present in her system. The court determined that an extended sentence was necessary to protect the public from further "serious criminal conduct by the Defendant." The court found that the Defendant's criminal history, her admitted history of substance abuse, and the facts of the present case showed "a progression in her behavior that created a substantial risk for the safety of the public." The court acknowledged the defense's theory that the Defendant was not impaired at the time of the crash based upon the preliminary hearing testimony of Ms. Sweet. The court found, though, that Ms. Sweet clarified that professional ethics prevented Ms. Sweet from testifying about impairment without reviewing the Defendant's medical history or having been at the scene of the crash. The court found that Ms. Sweet testified that consuming multiple substances could have a synergistic effect and that the Defendant admitted consuming marijuana, cocaine, Xanax, and fentanyl on the day before the accident. The court noted that the toxicology report showed the presence of all these substances. The court found, based upon the toxicology report and the levels of the substances present at the time of the blood draw, that a synergistic effect was created on her central nervous system. The court acknowledged that the Defendant had participated in multiple rehabilitation programs for substance abuse and that substance abuse treatment was an ongoing process. The court determined, though, that the Defendant's voluntary consumption of multiple drugs affected her central nervous system and her decision to operate a motor vehicle indicated a progression from which the public needs protection. The court determined that consecutive sentencing reasonably related to the severity of the offense based upon the Defendant's "unfortunate decision" to drive after consuming various intoxicants that impacted her central nervous system. The court ordered consecutive service of the six-year sentence and one of the four-year sentences, for an effective ten-year sentence.

The trial court denied the Defendant's request for alternative sentencing and ordered her to serve her sentence in confinement based upon the facts of the case. The court determined that confinement was necessary to protect society by restraining a defendant who has a long history of criminal conduct consisting of drug- and driving-related offenses. *See id*. § 40-35-103(1)(A) (2018). The court found that although the Defendant's lengthy criminal history did not involve violent felonies, her "history indicate[d] a pattern of behavior related to the offense before the [c]ourt." The court likewise determined that confinement was necessary to avoid depreciating the seriousness of the offense and that confinement was particularly suited to provide an effective deterrence to others likely to commit similar offenses. *See id*. § 40-35-103(1)(B). The court stated,

> There is no question as to the seriousness of the loss of life. The Court is of the opinion that the loss of life in this case was avoidable. By deciding to operate a motor vehicle while multiple drugs that synergistically affected the central nervous system were present, the Defendant was in disregard for how her actions could negatively impact the safety of the public at large. Unfortunately, her decision resulted in the loss of life. The Court believes, based on her testimony at the sentencing hearing, that the Defendant recognizes the serious impact of her decision of operating a motor vehicle after voluntarily consuming multiple drugs. However, the Court is of the opinion that, in order to maintain an appreciation for the seriousness of this offense, and to provide an effective deterrence for such offense, confinement is necessary.

Relative to the introduction of Suboxone into the jail, the trial court determined regardless of whether the Defendant intended to consume or sell drugs, the court considered the possession, consumption, and distribution of illegal substances in a jail to be a "serious" offense.

The trial court determined that less restrictive measures than confinement had been unsuccessfully applied to the Defendant "recently or frequently." *See id*. § 40-35-103(1)(C). The court determined that when the Defendant was serving a sentence on probation for possession of cocaine, she was arrested for possession of morphine and possession of drug paraphernalia, that she was placed on probation, and that she subsequently violated her probation. The court determined that when the Defendant was serving a sentence on probation for another possession of drug paraphernalia conviction, she was arrested for evading arrest. The court determined that the Defendant had participated in and completed numerous substance abuse rehabilitation programs. The court stated that although substance abuse treatment was an ongoing process, the court could not "overlook" the Defendant's decision to drive a motor vehicle after consuming multiple drugs, despite her previous treatment. This appeal followed.

-13-

The Defendant contends that the trial court erred by denying her request for alternative sentencing and by imposing partial consecutive service. The State responds that the trial court's findings and determinations are supported by the record.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2018).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

The standard of review for questions related to probation or any other alternative sentence is an abuse of discretion with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Generally, probation is available to a defendant sentenced to ten years or less. T.C.A. § 40-35-303(a) (2018). The burden of establishing suitability for probation rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* T.C.A. § 40-35-303(b); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

A sentence is based upon "the nature of the offense and the totality of the circumstances," including a defendant's background. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *see State v. Trotter*, 201 S.W.3d 651, 653 (Tenn. 2006). A trial court is permitted to sentence a defendant to incarceration when:

(A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C) (2018); *see Trotter*, 201 S.W.3d at 654. A trial court must consider (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's physical and mental health, and (6) the deterrence value to the defendant and others. *See State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017) (concluding that the same factors used to determine whether to impose judicial diversion are applicable in determining whether to impose probation); *see also State v. Electroplating*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996).

The record reflects that the trial court denied the Defendant's request for alternative sentencing based, in part, upon the need to protect society by restraining the Defendant because she had a long history of criminal conduct consisting of drug- and driving-related offenses and because less restrictive measures than confinement had been unsuccessfully applied to the Defendant "recently or frequently." *See* T.C.A. § 40-35-103(1)(A), (C). The court acknowledged that although the Defendant's criminal convictions did not involve violent offenses, her "history indicate[d] a pattern of behavior" related to controlled substances and driving. The Defendant had previous convictions for evading arrest, speeding, theft, drug possession, possession of drug paraphernalia, and driving while her license was suspended. The Defendant, likewise, admitted long-term drug and alcohol abuse. She admitted to drinking and using marijuana beginning at age twelve or thirteen. She likewise admitted using heroin, methamphetamine, and cocaine. Her previous drug possession convictions involved cocaine and morphine. Furthermore, the sentencing hearing exhibits reflect that the Defendant had received probation previously and that she violated the conditions of her release multiple times. The Defendant received probation for possession of cocaine, she violated the conditions of her release twice, and one violation was based upon an arrest for possession of morphine. The Defendant also received probation for her possession of morphine and drug paraphernalia convictions, and she violated the conditions of her release. The Defendant admitted her history showed that she generally used drugs and violated probation. Relative to whether the Defendant had the ability to rehabilitate, the court determined that the Defendant's criminal history and failure to comply with the terms of her previous probations "compounded" the court's concerns. The record supports the court's determinations that the Defendant had a long history of

-15-

criminal conduct and that measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the Defendant. We conclude the trial court did not err by denying the Defendant's request for an alternative sentence on these grounds.

The trial court likewise denied alternative sentencing on the basis that confinement was necessary to avoid depreciating the seriousness of the offense and to provide an effective deterrence to others likely to commit similar offenses. *See id*. § at (1)(B). Regarding the nature of the offense, the record reflects that after the crash, the Defendant was "lethargic and slow to respond to questions." She stated at the time of the crash that she "had been driving and smoking marijuana," and the toxicology report showed multiple controlled substances in the Defendant's system, including the presence of active methamphetamine compounds, fentanyl, active cocaine compounds, diazepam, and alprazolam. Although the Defendant argues that the court erred by determining that the Defendant was impaired at the time of the accident, the toxicology report supports the court's determination. Likewise, Ms. Sweet, an expert in toxicology, testified that the level of fentanyl in the Defendant's system was ten nanograms, which Ms. Sweet described as toxic. Ms. Sweet explained that fentanyl, in the context of driving a motor vehicle, caused poor vehicle control, weaving, poor coordination, slow response to stimuli, delayed reaction, and potentially falling asleep at the wheel. This is consistent with the Defendant's vehicle leaving its lane of travel and causing a head-on collision and with the Defendant's presentence investigation statements that "out of nowhere my vehicle abruptly stopped dead in [its] tracks" and that she did not recall "seeing the vehicle, [its] lights or anything." The side effects described by Ms. Sweet are likewise consistent with the circumstances of the offense provided at the guilty plea hearing in that the Defendant was lethargic and slow to respond to questions immediately after the crash. Although Ms. Sweet could not provide an opinion about whether the Defendant was impaired at the time of the crash because Ms. Sweet had not reviewed the Defendant's medical records and was not present at the scene, Ms. Sweet said that the Defendant could have experienced some of the side effects. Likewise, the therapeutic range for methamphetamine was ten to fifteen nanograms, and Ms. Sweet determined that the Defendant had a toxic amount of 515 nanograms in her system. Ms. Sweet stated that the combination of substances, such as fentanyl and methamphetamine, could create a synergistic effect on the central nervous system that would enhance the side effects of each substance and could result in confusion. We conclude that the evidence supports to the trial court's determination that the Defendant was impaired at the time of the crash.

However, in connection with depreciating the seriousness of the offense and the deterrence value to others, the trial court focused on the "seriousness of the loss of life." The court determined that the victim's death was avoidable, that the Defendant acted without regard for "how her actions could negatively impact the safety of the public at large," and that the Defendant's decision to drive after voluntarily consuming controlled substances resulted in the victim's death. The Defendant pleaded guilty to vehicular

homicide by reckless conduct, which is defined as "the reckless killing of another by the operation of an automobile . . . , as the proximate result of . . . [c]onduct creating substantial risk of death or serious bodily injury to a person[.]" *Id.* § 39-13-213(a)(1). Reckless conduct by a defendant that results in the death of a victim are elements of the conviction offense, and the elements alone are insufficient to deny probation based upon the need to prevent depreciating the seriousness of the offense and to deter others from committing similar offenses because the legislature determined that the offense is probation-eligible. *See Trent*, 533 S.W.3d at 293. The record does not reflect evidence that would support the denial of probation based upon the need to prevent depreciating the seriousness of the offense and to deter others. The trial court erred to the extent that it denied the Defendant's request for probation based upon the elements of the conviction offense.

However, the trial court's denial of probation based upon the remaining factors is supported by the record. The court properly applied enhancement factors (1), (8), and (10) based upon the Defendant's previous criminal history, her inability to comply with the terms of her previous sentences of probation, and her lack of hesitation about committing a crime when the risk to human life was high. The court considered the appropriate principles of sentencing, and the Defendant failed to demonstrate that she is a suitable candidate for alternative sentencing. The Defendant is not entitled to relief on this basis.

In reaching this conclusion, we have not overlooked the Defendant's argument that the trial court failed to consider mitigation evidence related to her childhood abuse that led to her alcohol and substance abuse. She argues that the trial court failed to consider and to apply the "catchall" mitigating factor (13) as result of her sentencing hearing testimony in this regard and a corresponding sentencing memorandum filed with the court under seal. *See* T.C.A. § 40-35-113(13). She also argues that the court failed to consider her remorse in causing the victim's death and her substance abuse treatment efforts. However, the trial court's order reflects that it considered the Defendant's personal history, along with her history of previous substance abuse treatment, and the testimony presented at the sentencing hearing. After considering the defense evidence, the court determined that no mitigating factors applied. Furthermore, the court's order reflects that it concluded the Defendant understood the severity of her conduct in causing the victim's death. The Defendant is not entitled to relief on this basis.

The record reflects that the trial court imposed partial consecutive service, in part, because the Defendant had an extensive record of criminal activity. *See* T.C.A. § 40-35-115(b)(2). Although the court acknowledged that the Defendant's criminal record did not involve violent offenses, her "history indicate[d] a pattern of behavior" related to controlled substances and driving. The Defendant had previous convictions for evading arrest, speeding, theft, drug possession, possession of drug paraphernalia, and driving while her license was suspended. The Defendant, likewise, admitted long-term drug and alcohol abuse. She reported during the presentence investigation that she graduated from high

-17-

school in 2009, that she began frequently drinking alcohol and smoking marijuana in 2002, that she used cocaine between 2009 and 2018, and that she frequently used methamphetamine in 2018. She also admitted using heroin. Her previous drug possession convictions involved cocaine and morphine. Furthermore, the Defendant had received probation previously, and she violated the conditions of her release multiple times. The Defendant received probation for possession of cocaine, she violated the conditions of her release twice, and one violation was based upon an arrest for possession of morphine. The Defendant also received probation for her possession of morphine and drug paraphernalia convictions, and she violated the conditions of her release. The Defendant admitted her history showed that she generally used drugs and violated probation. We conclude that the record supports the trial court's determination that the Defendant had an extensive record of criminal activity. The Defendant had multiple drug- and driving-related convictions and violated previous probations multiple times. She was likewise convicted of theft and evading arrest. Although the Defendant asserts that consecutive sentencing was improper because her criminal history does not involve violent offenses, her convictions and continued drug use support the trial court's order of consecutive sentencing. *See State v. Nakomis Jones*, No. W2004-01583-CCA-R3-CD, 2005 WL 2464681, at *10 (Tenn. Crim. App. Oct. 5, 2006), *perm. app. denied* (Tenn. Feb. 27, 2006) (concluding that consecutive service was proper based upon the defendant's previous drug-related convictions, probation violations, and continued drug use). The court's application of this factor alone is sufficient to support consecutive service.

The trial court, likewise, determined that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and that the Defendant had no hesitation about committing a crime in which the risk to human life was high. *See* T.C.A. § 40-35-115(b)(5). In order to impose consecutive sentences on the basis that a defendant is "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high," a trial court must also find that the sentences "are reasonably related to the severity of the offenses" and "are necessary in order to protect the public from further criminal acts" by the defendant. *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995); s*ee State v. Moore*, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996).

The trial court's determination was based upon the Defendant's use of multiple controlled substances and her decision to drive a motor vehicle when impaired. The court found that the Defendant's criminal history of drug-related and driving offenses, that her admitted substance abuse and addiction issues, which were extensive, and that the commission of the present offense showed "a progression in her behavior that created a substantial risk for the safety of the public." Likewise, the trial court determined that consecutive service reasonably related to the severity of the offense and was necessary in order to protect the public from further criminal acts by the Defendant. Although the court acknowledged that the Defendant had participated in multiple rehabilitation programs for

-18-

substance abuse and that substance abuse treatment was an ongoing process, it determined that the Defendant's voluntary consumption of multiple drugs affected her central nervous system and her decision to operate a motor vehicle indicated a progression from which the public needed protection.

The Defendant reported during the presentence investigation that she graduated from high school in 2009, that she began frequently drinking alcohol and smoking marijuana in 2002, that she used cocaine between 2009 and 2018, and that she frequently used methamphetamine in 2018. She admitted using heroin, as well. She had likewise entered eight substance abuse treatment programs between 2009 and 2016 but later relapsed. The Defendant, likewise, admitted at the sentencing hearing that her history showed that she generally used drugs and violated the conditions of her probation in previous cases. We note that the Defendant's two introduction of contraband into a penal facility convictions in this case occurred after the crash, at which time the levels of fentanyl and methamphetamine in the Defendant's system were toxic. The evidence does not preponderate against the court's findings, and we conclude that the court did not err by imposing consecutive service of the Defendant's sentences. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE